**UNITED STATES, Appellee,**

v.

**Sergeant First Class William H. BARDEN, SSN 245–70–3290, United States Army, Appellant.**

**CM 438377.**

U. S. Army Court of Military Review.

14 April 1980.

Colonel Edward S. Adamkewicz, Jr., JAGC; Lieutenant Colonel John F. Lymburner, JAGC; Major Lawrence D. Galehouse, JAGC; and Captain Robert M. Twiss, JAGC, were on the pleadings for appellant.

Lieutenant Colonel R. R. Boller, JAGC; Major David McNeill, Jr., JAGC; Captain Brian X. Bush, JAGC; and Captain Glenn D. Gillett, JAGC, were on the pleadings for appellee.

Before RECTOR, CARNE and O'DONNELL, Appellate Military Judges.

## OPINION OF THE COURT

O'DONNELL, Judge:

The appellant was convicted of wrongfully selling 0.52 grams of heroin (Specification 1), wrongfully transferring 0.62 grams of heroin (Specification 2), wrongfully possessing 3.03 grams of heroin (Specification 3), and wrongfully possessing 4.89 grams of marihuana (Specification 4), in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. His sentence to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for ten years, and reduction to the lowest enlisted grade was approved by the convening authority.

Following his pleas of not guilty, the appellant moved to suppress evidence of the heroin and marihuana which were the subject of Specifications 3 and 4 on the basis of an illegal search and seizure. After the military judge denied the motion, the parties entered into a stipulation which, although not conceding the legality of the search, admitted all of the essential facts relating to the offenses.[1]

The Government's position at trial was that the search of the appellant's apartment was conducted with the consent of the appellant and pursuant to a lawful authorization from the appropriate commander.[2] Before addressing the legality of the search, we note that the general rule that a voluntary plea of guilty waives nonjurisdictional defects (see e. g., McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)) does not apply to a "confessional stipulation." It is clear from the record that the appellant adopted the tactic of a stipulation rather than a guilty plea to preserve the search and seizure issue and that the judge acquiesced in that procedure. The legitimacy of such a tactical course of action was recognized in *United States v. Bertelson*, 3 M.J. 314 (C.M.A.1977). *See also, United States v. Rempe*, 49 C.M.R. 367 (A.F.C.M.R.1974). *Cf., United States v. Cox*, 464 F.2d 937 (6th Cir. 1972), where the Court honored an agreement between the accused and the prosecutor which was ac-

---

1. The appellant now contends that the military judge should not have accepted the stipulation as it practically amounted to a confession contrary to paragraph 154*b*(1) of the Manual for Courts-Martial, United States, 1969 (Revised edition). We are satisfied that the judge complied with the minimum requirements of *United States v. Bertelson*, 3 M.J. 314 (C.M.A.1977), and properly admitted the stipulation.

2. In denying the motion to suppress, the military judge gave no reasons for his ruling.

cepted by the trial judge whereby the accused's plea of guilty was entered with the express reservation that he could appeal an earlier denial of a motion to suppress illegally obtained evidence.

## I. CONSENT

■ One of the exceptions to the Fourth Amendment requirement for a warrant based on probable cause is a search conducted pursuant to the consent of the individual. The Government has the burden of showing that such consent was voluntary and not the result of duress or coercion based on the totality of the circumstances surrounding the consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We must, therefore, examine the circumstances leading up to the appellant's consent.

Because of the complexity of this case, a detailed explication of the facts is required. On the 12th of December 1978, Military Police Investigator Kevin Beason received information from one of his informants, a Private First Class Donaldson, that Sergeant First Class William H. Barden, the appellant, was going to be involved in a heroin transaction two days hence in a discotheque in Friedberg, Federal Republic of Germany. On the evening of the 14th, Beason talked with Maria Llanes, Donaldson's girl friend. Miss Llanes revealed that on 12 December the appellant had solicited her to sell heroin for him. The understanding, according to Beason's testimony, was that the appellant would provide ten packets of heroin for Miss Llanes to sell plus two additional packets for her own use.

Later that evening, Donaldson and Miss Llanes entered the discotheque while Beason, together with other law enforcement personnel, kept the establishment under surveillance. Miss Llanes, after determining that the appellant was due to arrive shortly at the bar, returned to the law enforcement personnel and was provided with $160.00 in American currency, the serial numbers of which had been recorded. She reentered the discotheque and after a brief period returned and informed the agents that she had met the appellant and exchanged the $160.00 for twelve packets of heroin. At this time, she indicated that she thought she should have received thirteen packets. Miss Llanes stated that the appellant was wearing a black sweater with vertical white stripes on the sleeves.

When it was determined that the appellant was no longer in the bar, a search of other bars in the vicinity of the discotheque was conducted with negative results. Beason then proceeded to the appellant's civilian apartment in nearby Nieder-Woellstadt. When the appellant came to the door of his apartment to meet another caller, a Sergeant Hunter, Beason informed him that a next-door neighbor wished to see him. Beason noticed that a female was in the apartment. The appellant went to the stairwell of the next apartment where he was apprehended by Beason and Military Police Investigator Robert Olsen. The appellant was wearing a black sweater with vertical white stripes on the sleeves. Beason searched him but did not find the $160.00 used in the sale.

At this juncture, Beason called Special Agent Randy Campbell and informed him that the appellant had been inside his apartment before he had been apprehended and that the money used in the purchase had not been recovered. Campbell told Beason to return to the apartment, remove the people from the apartment and secure the area until he returned with a search authorization. Beason and Olsen took the appellant back to his apartment which was still occupied by Sergeant Hunter and the female, later identified as Miss Bomeier. The appellant was in handirons secured behind his back. Beason searched Sergeant Hunter and Miss Bomeier's purse but did not remove them from the apartment. Beason stated that he entered the apartment rather than securing it from the outside to prevent the persons inside from secreting or destroying the funds used in the transaction.

While in the apartment, Beason walked around the living room purportedly to observe Miss Bomeier who, according to Bea-

son, was moving about in the apartment.[3] He noticed a magazine with what appeared to be the corner of a packet protruding. He lifted the magazine and saw specks of brown powder. He also looked behind a bar in the living room to determine if there were any weapons or contraband. He noticed several items to include folded paper packets, brown powder and a razor blade on or in the bar. In each instance, Beason believed the brown powder to be heroin. He also observed two hand-rolled cigarettes on the bar which he believed to contain marihuana. Subsequent analysis proved him correct in each instance.

Meanwhile, Special Agent Campbell proceeded to the appropriate commander to obtain a formal authorization to search for the $160.00 in controlled currency. While Campbell was obtaining the authorization, Special Agent Henry Mungle, another criminal investigator, arrived at the apartment. At this time, Sergeant Hunter and Miss Bomeier were directed to leave the apartment. Mungle advised the appellant of his right to counsel and his rights under Article 31 of the Uniform Code of Military Justice. The appellant waived his rights in this regard and in response to questions from Mungle and Beason admitted he sold heroin to Miss Llanes. Mungle then requested permission from the appellant to search the apartment after advising him that he did not have to consent. The appellant agreed. Mungle advised him further that Campbell was in the process of obtaining a formal search authorization and that if the authorization were approved, the apartment would be searched in any event. The appellant again agreed. The appellant, in response to a question from Mungle, disclosed the hiding place of the money in the apartment. Campbell arrived at this time with the search authorization. The heroin and marihuana previously discovered as a result of Beason's earlier search as well as the currency used in the purchase were then seized.

After he was brought to the military police office, the appellant signed a search consent form and a statement in which he admitted selling heroin to Miss Llanes and having a quantity of heroin in his apartment after the sale. The appellant also testified on the suppression motion, stating essentially that he consented to the search and executed his inculpatory statement because he knew that Beason had already discovered the contraband in the apartment.

In considering these facts, we note several significant areas relating to voluntariness—the appellant's custodial status; the advice given to the appellant as to his several rights; the incriminatory statements by the appellant; and the executed consent form. When the person consenting is in custody, the Government's burden of establishing voluntariness becomes more exacting. *See, United States v. Page*, 302 F.2d 81 (9th Cir. 1962); *United States v. Justice*, 13 U.S.C.M.A. 31, 32 C.M.R. 31 (1962). *See also, United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). There is no requirement to advise a person that he need not consent to a search. *Schneckloth v. Bustamonte, supra.* However, the giving of such advice is a factor tending to show voluntariness. *See United States v. Rothman*, 492 F.2d 1260 (9th Cir. 1973). The same is true when, as in this case, the person after having been advised of his Article 31 rights and of his right to counsel makes incriminatory statements. *See United States v. Holler*, 43 C.M.R. 461 (A.C.M.R.1970).

In our view, the crucial consideration is the legality of the initial search conducted in the apartment by Agent Beason. The Government's position at trial and before us is that there was no search. The evidence, however, is to the contrary. Beason himself testified that he went behind the bar to look for weapons and contraband. To determine whether Beason's search was legal we must examine the basis for the entry into the apartment and any limitations on his activities while there.

---

3. Olsen, on the other hand, testified that Miss Bomeier never left the living room area.

The Supreme Court has recognized—explicitly with respect to automobiles and inferentially as to private dwellings—the authority of law enforcement officers to conduct warrantless searches based on probable cause and exigent circumstances. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *See United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973), for an analysis of lower federal cases involving exigent circumstances justifying warrantless searches of private dwellings. *See also, United States v. Kinane*, 1 M.J. 309, 312–13 (C.M.A.1976); paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition).

We are satisfied that Investigator Beason had probable cause to believe that the money was in the appellant's apartment when he entered the dwelling. Although most of his information was based on hearsay, we are convinced that Miss Llanes was a reliable informant. She was seen in the discotheque where the sale was purportedly made. She left the bar several times and reported to members of the surveillance team. She correctly described the clothing worn by the appellant. Her statements were corroborated in part by information known to the military police authorities concerning the appellant's activities in the drug trade to include his modus operandi in using female operatives. Moreover, Beason and Campbell had talked with Miss Llanes for some 30–40 minutes earlier that evening and were impressed with her demeanor and her willingness to cooperate even though

she would not benefit financially and even though her boyfriend, Donaldson, might not benefit at all. Accordingly, we are satisfied that Beason could rely on Miss Llanes notwithstanding her status as a first-time informant. Furthermore, Beason knew that the appellant had returned to his apartment after the alleged sale. It was reasonable to conclude, as the money was not on the appellant's person, that it would be found in his apartment.

█ We are not convinced, however, of the existence of exigent circumstances. The appellant was apprehended outside his apartment. To be sure, there were still two people in the apartment, but there was no evidence of record from which to conclude that they were aware of his apprehension or that they knew the money was in the apartment and could be identified by the authorities. The situation changed to an extent when Beason entered the apartment with the appellant in custody. However, a self-generated exigency is insufficient. *See United States v. Marshall*, 488 F.2d 1169 (9th Cir. 1973). Moreover, there was no indication that either Sergeant Hunter or Miss Bomeier was engaged in the drug trade with the appellant or anyone else.[4]

As the circumstances did not require immediate action to prevent destruction or removal of the money, the entry and warrantless search cannot be justified on the basis of exigent circumstances. The appropriate procedure would have been to secure the premises to await the arrival of the search authorization. This is what Beason was told to do.[5] The problem, however, is that instead of securing, he searched. This was tantamount to a warrantless search without exigent circumstances and there-

---

4. At trial, the prosecutor justified the entry not only on the basis of a reasonable belief that the money was in the apartment but also on the basis of the probability of finding the thirteenth packet of heroin. The latter point has been abandoned on appeal and rightly so. Agent Beason testified that his sole purpose in entering the apartment was to protect the funds from removal or destruction. The evidence is

confusing as to whether there even was a thirteenth packet. Assuming arguendo the existence of this packet and the probability of its location in the apartment, there were no exigent circumstances indicating it would be destroyed or removed.

5. Actually, he was not told to wait inside, only to remove the visitors and secure the apartment.

fore illegal.[6] *See, United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978); *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975). *Cf., State v. Matsen*, 287 Or. 581, 601 P.2d 784 (1979). *See also* 2 Lafave, Search and Seizure, p. 450 § 6.5(c) (1978), for a discussion of the "impoundment alternative" to the warrantless search.

■ Although the fact of the initial illegal search is but another aspect of the "totality of the circumstances," it is particularly significant in the instant case. At the time he consented, the appellant knew that Beason had searched and discovered the marihuana and heroin. He was in custody, restrained by handirons. True, he consented after he had been advised of his rights, but the advice was given after the illegal search. Moreover, the appellant was informed that a warrant was being obtained and that a search would ultimately be conducted whether he consented or not.[7] Viewing the totality of the circumstances, we are not satisfied that the appellant's consent was voluntary.[8]

## II. FORMAL AUTHORIZATION TO SEARCH

■ The second facet of the Government's position is that, regardless of the validity of the consent, the search was legal because it was based on an authorization from the appropriate commander. The basic difficulty with this approach is that an illegal search had already been conducted by Agent Beason. The Government's theory appears to be that the fact of ultimate discovery pursuant to a formal authoriza-

tion removes the taint from the otherwise illegal search. *See People v. Fitzpatrick*, 32 N.Y.2d 490, 346 N.Y.S.2d 793, 300 N.E.2d 139, *cert. denied*, 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973).

In a similar case, the Sixth Circuit addressed this inevitability rule. *United States v. Griffin*, 502 F.2d 959 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). *Griffin* involved the search of an apartment for narcotics. The federal agents had probable cause but no exigent circumstances. One of the agents had been sent to obtain a search warrant while the others broke into the apartment to "secure it." After contraband was discovered, another agent was dispatched to expedite the warrant. The search warrant was ultimately procured. The court held that absent exigent circumstances justifying a warrantless entry, the police cannot enter a home without a warrant merely because they plan subsequently to get one. In rejecting the inevitability rule, the Court noted that any other view "would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment." 502 F.2d at 961.

We agree with *Griffin* and hold that the subsequent securing of an authorization to search did not validate the original search.[9] As that search was illegal and as the appellant did not voluntarily consent to the subsequent search, the judge should have granted the motion to suppress.

The findings of guilty of Specifications 3 and 4 of the Charge are set aside. Those

---

6. The facts, contrary to the Government's position, do not support a conclusion that Beason's activities amounted only to a plain-view search.

7. As the Supreme Court stated in *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Bumper* is often cited for the proposition that fraudulently claiming the existence of a warrant renders a consent involuntary. *Bumper*,

however, involved a valid warrant which was never introduced at trial.

8. The appellant's subsequently executed consent form was the product of the original search and did not serve *nunc pro tunc* to validate the involuntary consent.

9. Moreover, any search based on the authorization is questionable in view of the failure of the military authorities to comply with paragraph 2–10, USAREUP Supplement 1 to Army Regulation 190–22, dated 11 July 1978, which requires the presence of German police at a search of civilian off-post quarters. *See United States v. Dillard*, 8 M.J. 213 (C.M.A.1980).

charges are dismissed. The remaining find-
ings of guilty are affirmed. Only so much
of the sentence is affirmed as provides for
dishonorable discharge, forfeiture of all pay
and allowances, confinement at hard labor
for six years, and reduction to the lowest
enlisted grade.

Chief Judge RECTOR and Senior Judge
CARNE concur.