# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 26, 2013 Session

## STATE OF TENNESSEE v. RICKY WAYNE DAVIS, JR.

### Direct Appeal from the Criminal Court for Knox County
### No. 97274     Steve W. Sword, Judge

### No. E2012-01595-CCA-R3-CD - Filed August 14, 2013

A Knox County Grand Jury returned an indictment against Defendant, Ricky Wayne Davis, Jr. charging him with two counts of felony evading arrest, reckless endangerment, misdemeanor possession of marijuana, possession of drug paraphernalia, failure to provide evidence of financial responsibility, and failure to use a seat belt. After a jury trial, Defendant was found guilty of one count of evading arrest, misdemeanor possession of marijuana, failure to provide evidence of financial responsibility, and violation of the seatbelt law. He was found not guilty of one count of evading arrest and reckless endangerment, and the trial court dismissed the charge of possession of drug paraphernalia. The trial court sentenced Defendant to two years of probation for felony evading arrest and eleven months, twenty-nine days of probation for misdemeanor possession of marijuana, to be served concurrently. The trial court also imposed a fine of ten dollars for the seat belt violation and a fine of one-hundred dollars for failure to provide evidence of financial responsibility. On appeal, Defendant argues that (1) the trial court erred by denying his motion to suppress the evidence found in his vehicle; and (2) the evidence was insufficient to support his conviction for felony evading arrest. After a thorough review, we reverse the conviction for misdemeanor possession of marijuana. All other judgments are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Affirmed in Part; Reversed in Part

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Keith Lowe, Knoxville, Tennessee,  for the appellant, Ricky Wayne Davis, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jason Hunnicutt, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## I. Background

*Suppression Hearing*

At approximately 4:10 to 4:20 p.m. on August 16, 2010, Lieutenant Gordon Gwathney of the Knoxville Police Department was driving eastbound on Virginia Avenue when Defendant's vehicle, "a dark blue or black Cavalier," passed him in the westbound lane. As the two men met each other, Lieutenant Gwathney noticed that Defendant was not wearing his seat belt. Lieutenant Gwathney then made a U-turn, and as he did, Defendant "went from going at a normal speed to probably at least twice the normal speed." He explained that the speed limit on Virginia Avenue was thirty miles per hour. Lieutenant Gwathney testified that he drove sixty to eighty miles per hour to catch up to Defendant's car. Concerning the area where he and Defendant were driving, Lieutenant Gwathney said:

> That area is - - normally has a lot of people walking. There's a housing project there. There's the Emerald Youth Foundation, and also Jimmy's Mini Market there at the end of Virginia and Schofield. Didn't use his blinker light when he turned. I believe he turned onto Bowling right there, and then at Schofield, when I got to - - he was fishtailing the whole way because of his speed. When I got to - - when I got to Schofield and looked right - - when he turned right onto Schofield, there were several cars coming. I think he lost it and swerved over towards the cars.

Lieutenant Gwathney testified that he was able to see Defendant's vehicle the entire time, and he activated his blue lights after turning onto Schofield Street. He did not believe that Defendant could have seen his lights before that time because Defendant's car was so far ahead of him. Lieutenant Gwathney stopped at the intersection of Schofield Street and Tennessee Avenue. He then turned onto Tennessee Avenue and immediately activated his siren.

The video from Lieutenant Gwathney's patrol car was played for the jury, and he narrated during the video. He noted that he watched Defendant's car turn onto Bowling Avenue and Vermont Avenue, and he pointed out that Defendant's vehicle swerved and "almost tipped those cars right there." Lieutenant Gwathney explained that the camera in his patrol car recorded at "slow speed" until he activated his blue lights. The frame speed then became "real time instead of slow time." Additionally, he noted that the camera was set at "a wide angle. So things look smaller than they actually are." Lieutenant Gwathney further testified that although his video camera was pointed straight ahead, he could see out the side of the window of the vehicle. In addition to what was on the video, he noted that Defendant

-2-

"completely blew the stop sign there at Schofield and Tennessee." Lieutenant Gwathney testified that after Defendant pulled over and was arrested, he inventoried the vehicle. He found 2.4 grams of marijuana underneath the seat along with a metal box with some tweezers in it. He explained that he had Defendant's vehicle towed because it was blocking a driveway. Lieutenant Gwathney testified that Defendant did not give any explanation for his manner of driving and said that "he wasn't running." In his opinion, Defendant was a danger to the public. Lieutenant Gwathney testified: "He was driving normal until I turned around, and he - he floored it. He went from driving below normal to way past normal."

On cross-examination, Lieutenant Gwathney testified that he saw Defendant almost hit three cars, although it was not on the video. However, he pointed the vehicles out on the video. He further explained that he could "see around that - that little edge" even though the video did not capture beyond the edge and that the video camera did not show beyond the edge because it was "set at a factory wide-angle setting." Lieutenant Gwathney acknowledged that there was a hill on Schofield Street that went approximately to the intersection of Schofield Street and Tennessee Avenue. However, he could still see Defendant's vehicle. Lieutenant Gwathney noted that Defendant "fishtailed" when he "came down the hill. The back end apparently let loose." Lieutenant Gwathney also observed Defendant pass a white truck in a no-passing zone. When he pulled Defendant over, he noticed the smell of "hot brakes" as he approached Defendant's vehicle. Lieutenant Gwathney testified that he had Defendant's car towed because it was at the corner of a driveway "where you cannot turn left safely, and he did not even ask to leave his car there or ask for someone to come and get it." He noted that the Knoxville Police Department policy did not require him to try and make other arrangements before a vehicle was towed.

On re-cross examination, Defendant played the audio recording from the preliminary hearing. At the hearing, Lieutenant Gwathney said twice that he had Defendant's car towed because Defendant was in custody. Lieutenant Gwathney testified that he had watched the video at least three times since the preliminary hearing, and the car was towed because it was blocking the driveway.

Christopher Irwin, an attorney, testified on Defendant's behalf. He testified that defense counsel asked him to ride in the car with him to "measure distances and clearances and videotape and take photos. . ." Mr. Irwin then narrated the video while it was played in court. He testified that he took a photograph at "head level" of the intersection of Vermont Avenue and Schofield Street. Mr. Irwin noted that he was unable to see over the "hill" or "bend." He said that he drove the route four or five times and was unable to see traffic on the other side of the crest of the hill. Mr. Irwin also noted that while sitting on Vermont Avenue looking up at Schofield Street, he was unable to see any portion of Schofield Street before he got all the way to the intersection. He said that when he looked to the right of the car approaching Schofield Street, all he could see was a hill with houses, trees, and a concrete

embankment. Mr. Irwin testified that one had to be at the stop sign at the intersection of Bowling Avenue and Vermont Avenue in order to see down Vermont.

*Trial*

At trial, Lieutenant Gwathney's testimony was substantially the same as it was at the suppression hearing. He testified that on the day of the offenses, he was working overtime at the "KCDC housing development there at Western Heights." Lieutenant Gwathney explained that he patrolled the area "for criminal activity and anything to help keep the residents safe there." Lieutenant Gwathney testified that at approximately 4:00 p.m. on August 16, 2010, he was driving on Jourolman Avenue, and turned onto Virginia Avenue. He said, "[N]ot too far past the intersection, I passed the defendant there driving a dark colored Cavalier - - '98 Cavalier. Speeds were normal. I looked at him. He looked at me. He didn't have his seat belt on."

Lieutenant Gwathney believed his speed at the time to be under thirty miles per hour, and it was his impression that Defendant was also traveling within the speed limit (thirty miles per hour) at the time. Lieutenant Gwathney testified that the road was too narrow for a U-turn, so he did "more of a three-point turn." He said, "[W]hen I completed my turn, he was - - he went from driving slower than normal to way past normal, and he was almost out of sight." Lieutenant Gwathney testified that he drove sixty to eighty miles per hour to catch up with Defendant. He explained that his patrol car was equipped with a digital video system. He said, "I followed - - the main thing we're taught [is] to keep the vehicle in sight. It appears on the video that the vehicle's out of sight, but it's not. We have a wide-angle lens that makes things smaller." Lieutenant Gwathney also noted that the camera in his car was situated to the right of the driver and that the camera runs at a slow speed until "we flip our lights or sirens on, then it runs normal."

Lieutenant Gwathney again narrated the video from his patrol car taken at the time of the offenses. He noted that there was a housing development in the area, surrounded by residential houses. The only business in the area was a market located at the intersection of Virginia Avenue and Schofield Street. The Emerald Youth Foundation was located on Virginia Avenue at Bowling Avenue.

Concerning Defendant's driving, Lieutenant Gwathney testified:

It doesn't appear that I can see him go - - swerve over and almost hit those cars from the video, but, again, the video is at a wide-angle setting. It's not where the driver sits. It's to the right of me, and from this it doesn't appear that I see him do that, but I can see - - I'm not - - I'm actually in the other lane a little bit

-4-

so I can see over - - it's not a big hill. I can see over the small crest of the hill, he almost hit those cars.

He noted that the camera was pointed straight ahead of the car and not to the sides. Lieutenant Gwathney testified that Defendant "illegally" passed a white truck and ran through two stop signs. He noted that Defendant also swerved and almost hit three oncoming vehicles during the pursuit. Lieutenant Gwathney testified that he activated his blue lights after he turned onto Vermont Avenue from Bowling Avenue. He did not believe that Defendant could see his lights "until Schofield when we - - when I was catching up to the white truck that he passed."

Lieutenant Gwathney testified that he activated his siren when he turned onto Tennessee Avenue from Schofield Street. Defendant did not apply his brakes until Lieutenant Gwathney had almost caught up to him. Lieutenant Gwathney noted that he could see Defendant's car "the whole time. It - - the only time that I - - that I lost it for a minute is when he first made that turn, but as soon as my car got there, I - - and - - and got over in that other lane, I saw his car."

Lieutenant Gwathney testified that after Defendant stopped his vehicle, he asked Defendant to throw his keys out the window. He noticed the smell of "hot" or "burnt" breaks when he approached Defendant's vehicle, which indicated "hard braking." For officer safety, Lieutenant Gwathney ordered Defendant to get out of the car and lie down on the ground with his hands out. He then handcuffed Defendant and placed him under arrest. Defendant denied attempting to flee. He was placed in Lieutenant Gwathney's patrol car, and Lieutenant Gwathney began searching the vehicle. He noted that the vehicle was parked at the corner of a driveway. He said:

> You can legally park on that road, but you cannot block somebody from leaving their - - their property. If somebody were to come from that driveway and turn left, they could not safely turn left. They couldn't see around the car, and it's - - it's right up to the edge of the driveway. So that's - - that's why I towed the vehicle.

When asked if he told Defendant that the car would be towed, Lieutenant Gwathney testified: "I told him that - - yes. I told him that it was going to be towed, and at no point did he ask for somebody to come and get the vehicle." Lieutenant Gwathney noted that protocol for the Knoxville Police Department required him to perform an inventory search of the vehicle "so we don't send anything to the - - to the city pound that can hurt the civilian workers."

Lieutenant Gwathney testified that he searched Defendant's car and found 2.4 grams of marijuana in a small baggie under the driver's seat. There was also a metal container with

a pair of tweezers in it. He opined that the tweezers were used to smoke marijuana. Lieutenant Gwathney testified that Defendant's driver's license was valid, but he did not have proof of insurance.

On cross-examination, Lieutenant Gwathney testified that the camera in his patrol car was suspended from " a glued piece of lead on the windshield." He noted that it was actually lower than the rearview mirror and located at "almost eye level, not quite." He estimated that the camera was positioned "a foot and a half" to his right. According to Lieutenant Gwathney, it took him approximately twelve seconds to turn around after he met Defendant, and he heard Defendant's engine "rev up" as soon as he met and passed Defendant. He said that by the time that he got turned around, Defendant's car was "way ahead" of him. Lieutenant Gwathney did not immediately activate his blue lights because of the distance between his car and Defendant's. He later activated them when he came to an intersection. Lieutenant Gwathney testified that during the pursuit, he lost sight of Defendant's vehicle for "a little bit" at the intersection of Schofield Street and Vermont Avenue. He explained that out of the corner of his eye, he saw Defendant turn from Vermont Avenue onto Schofield Street. He also testified that Defendant almost hit two vehicles rather than three, and Defendant illegally passed a white truck. Lieutenant Gwathney testified that the video from his patrol car "doesn't lie, but it doesn't capture everything." He admitted that there was a "slight grade" on Schofield Street, and the road curved slightly to the right. However, he could see beyond the curve. Lieutenant Gwathney agreed that according to the video, Defendant came to a stop ten seconds after he activated his siren. He believed that Defendant should have seen his car with the blue lights activated before they turned onto Tennessee Avenue.

Lieutenant Gwathney testified that Defendant was compliant after his vehicle stopped, and he did not resist in any way. He noted that the substance in Defendant's car appeared to be marijuana. He later filled out the paperwork for the substance to be sent to the Tennessee Bureau of Investigation laboratory, but it was never sent to be tested. Lieutenant Gwathney testified that Defendant placed the public in danger by speeding by a daycare at the intersection of Virginia Avenue and Vermont Avenue, and he noted that the area was a "high residential" area where most people walked because they did not have a vehicle. He further testified: "The two vehicles, him passing the - - the reckless driving, him passing the white truck on the wrong side of the road, not stopping at two stop signs - - not one, two." Lieutenant Gwathney did not know if there was anyone outside of the daycare when Defendant drove by. He specifically noted that Defendant put "the people in the vehicles [in danger], especially the white truck passing on the wrong side of the road."

Christopher Irwin testified that he helped trial counsel make a video of the route driven by Lieutenant Gwathney and Defendant. He noted that while on Bowling Avenue, he could not see Schofield Street because "[t]he houses were in the way." When asked if he

could see Schofield Street, other than what was directly in front of him, while traveling on Vermont Avenue, Mr. Irwin noted that he could not because there was a hill in the way. Mr. Irwin testified that while traveling on Schofield, he could not see over the hill or around the bend. He and trial counsel drove the route five times, and he was never able to see traffic coming around the bend.

## II. Analysis

### A. Motion to Suppress

Defendant contends that the trial court erred by denying Defendant's motion to suppress the marijuana found during a search of his vehicle. He argues that the search was not a lawful search incident to an arrest nor was it a lawful inventory search. The State concedes that the search was not lawful. We agree.

The findings of the fact by the trial court in a suppression hearing will be upheld by the appellate court unless the evidence preponderates otherwise. *State v. Williams,* 185 S.W.3d 311, 314 (Tenn. 2006). The prevailing party in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. *Id.* at 314-15. The application of the law to the facts is a question of law that the appellate court reviews de novo. *Id.* at 315. The burden is on the State to prove that a warrantless search was constitutionally permissible. *State v. Nicholson,* 188 S.W.3d 649, 656–57 (Tenn. 2006).

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution similarly guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." "[U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the state demonstrates that the search was conducted under one of the narrowly defined exceptions to the warrant requirement." *State v. Cox,* 171 S.W.3d 174, 179 (Tenn. 2005). These exceptions include searches incident to a lawful arrest, consensual searches, searches incident to the "hot pursuit" of a fleeing criminal, "stop and frisk" searches, and searches based on probable cause under exigent circumstances. *State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983), citing *State v. Shaw*, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980). A police officer may also conduct a warrantless inventory of a lawfully impounded vehicle in the absence of probable cause that the vehicle contains evidence subject to seizure or exigent circumstances. *State v. Watkins*, 827 S.W.2d 293, 295 (Tenn.

1992), citing *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *State v. Glenn*, 649 S.W.2d 584, 588 (Tenn. 1983).

The trial court in this case made the following findings concerning Defendant's motion to suppress:

> The question becomes was there a justification for searching the vehicle and finding the other contraband that was allegedly located in the defendant's car, and there's two factors. You know, this is a warrantless search, and the presumption is that this was an unreasonable search of the vehicle that led to the discovery of the contraband. There are two exceptions to that warrant requirement that I believe apply here.
>
> The first is search incident to a lawful arrest, and if an individual is in lawful arrest, then a search of the vehicle the person was an occupant of, as long as it's contemporaneous with that arrest, once the defendant is removed and put in the back of the cruiser, under *New York v. Belton*, *State v. Watkins*, and *State v. Reid* here in Tennessee, even if that person's been neutralized and placed in the back seat of the cruiser, the officer may conduct the search of the occupant space of the vehicle.
>
> And so I think the officer would have been justified for that. He testified that he conducted an inventory search of the vehicle. That can be done whether under all the circumstances is [sic] reasonable grounds for an impoundment of the vehicle, and under State v. Drinkard which was a Tennessee Supreme Court case from 1979, when you look at all those circumstances, was it reasonable for the car to be impounded? In this case the officer testifies that the positioning of the vehicle made it difficult for the resident there who - - the driveway where the vehicle was parked right in front of would make it very difficult for them to pull out and turn left there.
>
> It's hard to tell that from the video. You can see the driveway there and the corner of the defendant's vehicle, but, in any event, I think that under those circumstances that there was no one else there to drive the vehicle away. There are no other occupants of the car. The defendant was the only one in there. He didn't request for somebody else to come and get it. I think that it was not unreasonable for the officer to impound the vehicle at that point, and therefore, a search would also be valid under an inventory search, and so I'm going to deny your motion at this time to suppress the evidence due to either the stop or the search.

First, Defendant argues, and the State concedes that the search in this case was not a valid search incident to arrest. We agree. In *Arizona v. Gant*, 556 U.S. 332, 343 (2009), the Supreme Court held that an officer may search a vehicle "incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." The Court further held that a search of a vehicle incident to a lawful arrest is justified when it is '"reasonable to believe evidence *relevant to the crime of arrest* might be found in the vehicle."' *Id.* (emphasis added)(internal citations omitted). "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe that the vehicle contains relevant evidence." *Id*.

In this case, Defendant was not within reaching distance of the passenger compartment at the time of the search since he was handcuffed and in the back seat of Lieutenant Gwathney's patrol car. Nor was there reasonable basis to believe that the vehicle contained relevant evidence of the crime for which he was arrested, felony evading arrest. Therefore, the warrantless search of defendant's vehicle as a search incident to a lawful arrest was not constitutional.

Defendant next argues, and the State concedes, that the search was not a lawful inventory search. We agree. A valid inventory search depends on whether it was reasonably necessary to impound the arrested person's vehicle. *State v. Lunsford*, 655 S.W.2d 921, 923 (Tenn. 1983). An "inventory search . . . is ostensibly to protect the occupant of the vehicle against loss of his property or the law enforcement agency against the occupant's claim for failure to guard against such loss." *State v. Donald Curtis Reid*, No. M1999-00058-CCA-R3-CD, 2000 WL 502678 (Tenn. Crim. App. Apr. 28, 2000). In *Drinkard v. State*, 584 S.W.2d 650, 653 (Tenn. 1979) our supreme court established the following guidelines concerning the impoundment of a vehicle:

> [I]f the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. Just cause to search the driver is not alone, enough; there must also be reasonable cause to take his vehicle into custody.

The burden is on the State to show that the impoundment was necessary. *Id*. at 354. Concerning the factors to consider as to whether an impoundment of the vehicle is reasonable, our supreme court further opined:

[T]he officer [must] advise a present, silent arrestee that his car will be impounded unless he can provide a reasonable alternative to impoundment. Our holding does not mandate that an arrestee must be advised of all available options to impoundment; such a per se rule would be unworkable because of changing conditions and circumstances. However, the extent of the consultation with an arrestee is a factor for the trial judge to consider in determining whether the impoundment was reasonable and necessary.

*State v. Lunsford*, 655 S.W.2d 921, 924 (Tenn. 1983)(quoting *Sanders v. State*, 403 So.2d 973, 974 (Fla. 1981).

In this case, the State failed to show that impoundment was necessary. Defendant was alone, and his car was parked at the corner of a driveway, as reflected in the video. Lieutenant Gwathney testified:

You can legally park on that road, but you cannot block somebody from leaving their - - their property. If somebody were to come from that driveway and turn left, they could not safely turn left. They couldn't see around the car, and it's - - it's right up to the edge of the driveway. So that's - - that's why I towed the vehicle.

When asked if he told Defendant that the car would be towed, Lieutenant Gwathney testified: "I told him that - - yes. I told him that it was going to be towed, and at no point did he ask for somebody to come and get the vehicle." On the video of the stop, Lieutenant Gwathney is heard telling Defendant that his car would be at the "city pound." Defendant did not ask to have anyone pick up the vehicle and at one point asked to call the mother of his children because "they" were waiting on him to pick them up. Lieutenant Gwathney noted that protocol for the Knoxville Police Department required him to perform an inventory search of the vehicle "so we don't send anything to the - - to the city pound that can hurt the civilian workers." Defendant's driver's license was valid; however, Lieutenant Gwathney testified that Defendant did not have proof of insurance.

In this case Lieutenant Gwathney did not advise Defendant that his vehicle would be impounded unless he could provide a reasonable alternative to impoundment. He simply told Defendant that his car would be at the "city pound." Further we note that Lieutenant Gwathney testified that parking was allowed on the side of the road, and from Lieutenant Gwathney's testimony, Defendant's vehicle was not blocking ingress and egress via the driveway, but was only parked closer to the driveway than the officer though was appropriate.

B. *Sufficiency of the Evidence*

Defendant argues that the evidence presented at trial was insufficient to support his conviction for felony evading arrest. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

It is an offense for a "person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from such officer to bring the vehicle to a stop." Tenn.Code Ann. § 39-16-603(b)(1). The offense of evading arrest while driving a motor vehicle is a Class E felony "unless the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties, in which case a violation of subsection (b) is a Class D felony." *Id.* § 39-16-603(b)(3). The jury in the present case found Defendant not guilty of felony evading by "intentionally flee[ing]" from Lieutenant Gwathney. He was found guilty of evading arrest by "intentionally attempt[ing] to elude" Lieutenant Gwathney after having received any signal from the officer to stop.

The evidence, taken in a light most favorable to the State, shows that Lieutenant Gwathney was driving on Virginia Avenue when he met Defendant, who was driving in the opposite direction, and he noticed that Defendant was not wearing a seatbelt. At the time, both vehicles were traveling the speed limit. Lieutenant Gwathney turned around, and when he completed the turn, Defendant "went from driving slower than normal to way past normal, and he was almost out of sight." He then drove sixty to eighty miles per hour in an attempt to catch up with Defendant. During the video of the stop, Defendant acknowledged, "How did I know that you were turning around on me?" This is circumstantial evidence that Defendant knew that Lieutenant Gwathney was turning around to pursue him. In any event, the officer signaled Defendant to stop when the blue lights were turned on, well before Defendant finally stopped after the officer turned on his siren. At that point, Defendant

accelerated and began driving beyond the speed limit in an attempt to elude Lieutenant Gwathney.

Lieutenant Gwathney testified that his patrol car was equipped with a digital video system. He noted that although on the video it appeared that Defendant's car was out of sight, it was not. He said, "We have a wide-angle lens that makes things smaller." Lieutenant Gwathney admitted that he lost sight of Defendant's vehicle for "a little bit" at the intersection of Schofield Street and Vermont Avenue. However, he explained that out of the corner of his eye, he saw Defendant turn from Vermont Avenue onto Schofield Street. At the intersection of Vermont and Schofield, Lieutenant Gwathney activated his blue lights. Lieutenant Gwathney testified that Defendant almost hit two vehicles and illegally passed a white truck in a no passing zone while traveling on Schofield Street. He noted that during the pursuit, Defendant also ran two stop signs. The video recording clearly showed Defendant driving past one stop sign without stopping. Defendant did not apply his brakes until Lieutenant Gwathney had activated his siren when he turned from Schofield Street onto Tennessee Avenue and had almost caught up with Defendant. Lieutenant Gwathney noted that when he approached Defendant's car, he smelled "hot" or "burnt" breaks indicating "hard breaking."

Defendant, citing the "physical facts rule" argues that Lieutenant's Gwathney's testimony was contradicted by the video taken by Mr. Irwin of the area on Schofield where the officer testified that Defendant almost hit two cars and illegally passed a truck and by the video from Lieutenant Gwathney's patrol car. He essentially contends that it was impossible for Lieutenant Gwathney to have seen Defendant almost hit the two cars on Schofield and illegally pass a truck because his visibility would have been limited by "the crest of the hill" he was traveling toward. A panel of this court has said,

> The so-called "physical facts rule" is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it. As stated by the Court in *Wood v. United States,* 342 F.2d 708, 713 (8th Cir.1965), "where undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established." *State v. Hornsby,* 858 S.W.2d 892, 894 (Tenn. 1993) (internal citations omitted). "Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that ... could not

-12-

have occurred under the laws of nature." *State v. Allen,* 259 S.W.3d 671, 680 (Tenn. 2008). If a witness's testimony is impossible to reconcile with physical evidence, an appellate court is not bound to consider it when determining whether the evidence was sufficient to support the conviction. *Id.* (citing *Hornsby,* 858 S.W.2d at 894). However, an appellant may not invoke the "physical facts rule" when the application of it is dependent on "assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of vehicles." *Hornsby,* 858 S.W.2d at 895 (citing *Waller v. Morgan,* 23 Tenn.App. 355, 133 S.W.2d 614, 616 (Tenn. Ct. App. 1939)).

*State v. Trutonio Yancey and Bernard McThune*, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369 (Tenn. Crim. App. Sept. 17, 2012).

We conclude that the physical facts rule is inapplicable in this case. Lieutenant Gwathney's testimony on its face was not unbelievable, and his testimony also involved "uncertain matters in the movement of vehicles." *Id.* The jury obviously accredited Lieutenant Gwathney's testimony that he could see Defendant's vehicle almost hit two cars and illegally pass a truck while on Schofield Street. In fact, after Defendant's arrest, the video from Lieutenant Gwathney's patrol car reflects that he informed Defendant that Defendant almost hit several vehicles as he was attempting to elude the officer.

Based on Lieutenant Gwathney's testimony, a reasonable trier of fact could find that Defendant's driving caused a risk of death or injury to others beyond a reasonable doubt. As pointed out by the State, the Tennessee Supreme Court has held that the driver of a vehicle creates a risk of death or injury to innocent bystanders and other third parties when that driver operates a car "heedless of the traffic signals" such as Defendant did in this case. *State v. Turner*, 193 S.W.3d 522, 525 (Tenn. 2006). Defendant is not entitled to relief on this issue.

In conclusion, we reverse the conviction for misdemeanor possession of marijuana because the trial court erred by denying the motion to suppress all evidence obtained in the warrantless search of Defendant's vehicle. The remaining judgments are affirmed.

THOMAS T. WOODALL, JUDGE